AMOCO OIL COMPANY, a Maryland
Corporation, Petitioner,

v.

Dale A. ERVIN, Mike Wallen, Don R.
Plummer, Richard B. Rush, Rodger D.
Kruger, Norman Smith, and the Estate
of Norman Smith (Daniel T. Smith, Per-
sonal Representative), Gregory S. Hear-
ing, Leslie R. Koehnen, Edward J. Cook,
Stephen D. Cameron, Richard D. Ones-
lager, Rodney O. Marshall, John Galli,
John L. Weibel, Herbert Hawley, Wil-
liam J. ("Bill") Mattedi, Gerald W. Hu-
man, Roger ("Rodger") Scott, Robert H.
Schroeder, and the Estate of Robert H.
Schroeder (Jeanne Schroeder, Personal
Representative), and Samuel W. Geist,
Respondents.

No. 94SC452.

Supreme Court of Colorado,
En Banc.

Dec. 4, 1995.

As Modified on Denial of Rehearing
Jan. 16, 1996.

Kirkland & Ellis, Frank Cicero, Jr., John A. DeSisto, Denver, Krendl, Horowitz & Krendl, E. Lee Reichert, Denver, Amoco Corporation, William J. Noble, Chicago, Illinois, Kirkland & Ellis, Richard C. Godfrey, Chicago, Illinois, for Petitioner.

Hubert M. Safran, Denver, Farrell & La Mantia, Mark A. La Mantia, Rosemont, Illinois, for Respondents.

Breit, Bosch, Levin and Coppola, P.C., Bradley A. Levin, Denver, for Amicus Curiae Colorado Trial Lawyers Association.

Justice SCOTT delivered the Opinion of the Court.

We granted certiorari to review *Ervin v. Amoco Oil Co.*, 885 P.2d 246 (Colo.App. 1994).[1] Petitioner Amoco Oil Company (Amoco) appeals the court of appeals' decision to affirm a judgment entered on a jury verdict in favor of respondents, sixteen current or former Amoco brand retail service station dealers doing business in Colorado (collectively referred to as "dealers"). The court of appeals held that Amoco breached an implied covenant of good faith and fair dealing and tortiously interfered with prospective business relationships. We affirm in part, reverse in part, and remand to the court of appeals with directions that it return the case to the trial court with instructions that damages be recalculated.

I

Amoco, a Maryland corporation, is a nationwide manufacturer, transporter, and marketer of petroleum products. Amoco distributes its products through a dual distribution system. As a landlord, Amoco leases service station facilities to independent service station dealers in various states, including Colorado. Amoco sells its products to these independent dealers who then resell the same to the public. Amoco also sells its products directly to the public through its own company operated stations.

Amoco entered into written lease and dealer supply agreements (agreements) with various dealers in the state of Colorado. The lease agreements provided that "[l]essee shall pay to Lessor as rent for the Premises, the sum of [a designated amount] per month during the term of this Lease unless a variable monthly rental is indicated below...." Under these agreements, Amoco leased both service station facilities and real property to each dealer. Both the lease and supply agreements had terms of one to three years; contained integration, cancellation, and merger clauses; and included specific dollar amounts of rent. Pursuant to the agreements, Amoco internally calculated the amount of rent it would collect from each dealer for its service station properties. Since 1985, Amoco has used its Investment Value Report program (IVR) to determine its Colorado rental goals. Using the IVR program, Amoco calculates the amount of rent based on the asset value of each service station.

Prior to adopting asset based rental valuations, Amoco calculated the rent amount based on the sale of gasoline at a particular station (gallonage rent program). Under the gallonage rent program, dealers paid a specific rental amount for every gallon of gasoline sold. However, Amoco decided the gallonage rent program provided a disincentive to sell more gasoline because a dealer's rent

1. We granted certiorari to address these issues.

 1. Whether the court of appeals erred by rewriting rental terms of the lease contracts so as to relieve the plaintiffs of their obligation to pay the contractually agreed-upon amounts of rent and holding that an independent cause of action exists for breach of an implied covenant of good faith and fair dealing that can override and nullify express, non-discretionary contract terms.

 2. Whether the court of appeals committed legal error by creating the new tort of "economic pressure," under which a supplier's lawful retail price competition with its independent distributors can subject that supplier to liability in tort.

 3. Whether the court of appeals holding relating to the breach of good faith and fair dealing is preempted by the Petroleum Marketing Practices Act, 15 U.S.C. 2806 (1988).

 4. Whether the court of appeals holding relating to the claim of intentional interference with contractual relations brings Colorado law into direct conflict with antitrust laws.

would increase with higher sales. In part to correct this disincentive, Amoco instituted an asset based calculation to determine rent payments under the agreements. In essence, Amoco sought to move fixed costs from the gasoline operation to the value of the real estate for each dealership. Following this philosophy, Amoco eventually promulgated the IVR program.

Under the IVR program, Amoco first determines the market value of the land, which is appraised at its highest and best use. Second, Amoco establishes a value for capital improvements. Capital improvements include buildings, machinery, equipment, furniture, and fixtures. Amoco adds together the original dollar amounts (i.e., investment value) paid for the improvements, regardless of when the money was spent. Next, the market value of the land and the value attributed to capital improvements are added together to determine the investment base. Amoco charges eight percent of the investment base to calculate a dealer's capital charge. Finally, Amoco adds other fees to the eight percent capital charge.

Each year the previous three years worth of maintenance costs are totalled and averaged. The annual average becomes the maintenance portion of the rent for the next fiscal year. Amoco also adds a charge for real estate and personal property taxes paid on a particular location. In addition to these figures, on full facility operations, Amoco applies a uniform charge for each automotive service bay despite the inclusion of buildings, equipment, machinery, and fixtures in the capital improvements portion of rent calculations. The dealers contend they are being double charged on the service bays because the capital improvement component covered that cost. Amoco adds the capital charge, average maintenance cost, taxes, and service bay charges to calculate the rent for a particular location.[2]

On June 20, 1988, the dealers initiated suit against Amoco, alleging breach of the agreements and tortious interference with prospective business relations. The dealers' complaint contained seven claims, four of which were dismissed prior to trial. The remaining three counts were submitted to

2. The following example comes from an internal Amoco presentation:

| | |
|---|---|
| Appraised Land Value | $ 85,000 |
| Building Cost | $100,000 |
| Machinery, Equipment, Furniture and Fixtures | $ 50,000 |
| Total Investment Base | $235,000 |

Capital charge equals $235,000 × 8% = $18,800.

Additional IVR factors:

| | |
|---|---|
| Total Maintenance for three previous years | $ 15,000 |
| Average Annual Maintenance | $ 5,000 |
| Actual Real Estate and Property Taxes Previous Calendar Year | $ 4,000 |
| Rent Increment for Next Fiscal Year | $ 4,000 |
| Uniform Charge per Service Bay | $ 4,500 per bay/per year |

Under this example, rent for a three service bay station would be calculated by adding the following figures:

| | |
|---|---|
| Capital Charge (Land & Improvements) | $ 18,800 |
| Service Bay Charge (3 × $4,500) | $ 13,500 |
| Maintenance | $ 5,000 |
| Taxes | $ 4,000 |
| Total | $ 41,300 |

The rent total may be adjusted for discounts, which include temporary construction waivers of rent, rental assistance programs, and eighteen and twenty-four hour incentive programs.

the jury. The jury returned a verdict in favor of the dealers for over $2.5 million in damages, prejudgment interest, and costs for breach of an implied covenant of good faith and fair dealing and tortious interference with prospective business relations. Amoco appealed the judgment entered on the jury verdict.[3]

The court of appeals affirmed the judgment of the trial court. *Ervin v. Amoco Oil Co.*, 885 P.2d 246 (Colo.App.1994). It concluded that the record supported a finding that the covenant of good faith and fair dealing was breached. *Id.* at 250. The court of appeals also held that the dealers established a prima facie case of tortious interference, and the trial court properly submitted that claim to the jury. *Id.* at 253. Amoco appealed.

## II

### Breach of Contract: Implied Covenant of Good Faith and Fair Dealing

The dealers claimed that Amoco breached its contractual obligations under the implied covenant of good faith and fair dealing by abusing its power, acting outside the scope of its discretion, and usurping the benefits of the agreements. Specifically, the complaint alleged that Amoco reserved discretion to make certain decisions, including establishing the purchase price for motor fuel, station rentals, station hours, and credit arrangements. The dealers asserted that Amoco's use of the IVR Program for the internal calculation of rents resulted in redundant

service bay charges. They claimed that, by charging twice for service bays, Amoco abused its discretion. This abuse resulted in a breach of Amoco's implied duty of good faith and fair dealing.

Although the agreements were fully integrated, the trial court admitted parol evidence on the issue of breach of duty of good faith and fair dealing. The jury was instructed to enforce the agreements according to the reasonable expectations of the parties and determine rental overcharges for service bays based on the IVR method employed by Amoco. The jury found that Amoco breached its implied duty of good faith and fair dealing, rendered a verdict in favor of the dealers, and awarded the dealers a total of $987,125 in "rental damages."

On appeal, Amoco contended that the trial court's introduction of parol evidence in this case was improper because the lease agreements were unambiguous and fully integrated. *See Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc.*, 195 Colo. 253, 256, 577 P.2d 748, 750 (1978). Amoco argued that the trial court improperly allowed the jury to rewrite unambiguous and fully integrated lease agreements in three respects: (1) dealers were relieved of their obligation to pay rents and Amoco was precluded from collecting rents; (2) the rental amount was rewritten entirely;[4] and (3) the paragraph barring both implied covenants and modifications absent written agreement of both parties was deleted.[5]

3. The dealers cross-appealed a summary judgment entered in favor of Amoco on a claim that it violated Colorado's Unfair Practices Act, § 6–2–101, 2 C.R.S. (1992), and an order denying damages for certicare signs on Amoco's capital asset ledger calculations. Those issues, however, are not before us.

4. Amoco claims it had discretion to modify the rental amount. The lease provides:

Modification of Rental. In the event that the original term of this Lease is for more than one year, each year of said term Lessor reserves the right to modify the monthly rental specified above to conform with Lessor's established policy rental in effect for this type of facility as of each anniversary date of the commencement of the term by giving Lessee at least ninety (90) days' advance notice of such changed rental, and

Lessee shall have the right at any time during said ninety (90) day period to terminate this Lease upon giving fifteen (15) days' notice in writing.

5. The lease agreement states:

No obligations, agreements or understandings shall be implied from any of the terms and provisions of this Lease, all obligations, agreements and understandings with respect to the subject matter hereof being expressly set forth herein. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this Lease. No modification or waiver of, addition to, or deletion from the terms of this Lease shall be effective unless reduced to writing and signed by Lessee and a representative of Lessor authorized to execute this Lease.

The court of appeals rejected Amoco's arguments, holding that although "payment [by the dealers] of the actual fixed monthly rental amount is non-discretionary," Amoco retained discretionary authority to modify the rent charges. *Ervin*, 885 P.2d at 251. This authority, granted by contract, is circumscribed by the duty of good faith and fair dealing. *See id.* at 250–51. The court of appeals concluded that the dealers were being charged twice for service bay charges in the rental calculation, and a jury could conclude that the covenant of good faith and fair dealing was breached. *Id.* at 251.

## A

■ Colorado, like the majority of jurisdictions, recognizes that every contract contains an implied duty of good faith and fair dealing. § 4–1–203, 2 C.R.S. (1992) ("Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement."); *see, e.g., Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1362 (Colo.App.1994); *Friedman v. Colorado Nat'l Bank*, 825 P.2d 1033, 1042 (Colo.App.1991), *rev'd on other grounds*, 846 P.2d 159 (Colo.1993); *Ruff v. Yuma County Transp. Co.*, 690 P.2d 1296, 1298 (Colo.App. 1984); *see also Larese v. Creamland Dairies, Inc.*, 767 F.2d 716, 717 (10th Cir.1985) (explaining that the franchisor-franchisee relationship is one that requires the parties to deal with one another in good faith and in a commercially reasonable manner); *see generally* Restatement (Second) of Contracts § 205 (1981); 3 Arthur Linton Corbin, *Corbin on Contracts* § 561, at 278 n. 2 (1960); Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369, 369 (1980) [hereinafter Burton I].

■ The good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations. *See State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 168 (Colo. 1993); *Davis v. M.L.G. Corp.*, 712 P.2d 985, 989 (Colo.1986); Steven J. Burton, *More on Good Faith Performance of a Contract: A Reply to Professor Summers*, 69 Iowa L.Rev. 497, 499 (1984) [hereinafter Burton II].

Good faith performance of a contract involves "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Wells Fargo*, 872 P.2d at 1363 (citing Restatement (Second) of Contracts § 205 cmt. a (1981)). The application of the reasonable expectations doctrine often "fails to give effect to some hornbook rules governing the construction of contracts," including "the precept that contracts which are free from ambiguity are to be enforced as written...." *Davis*, 712 P.2d at 990 & n. 7. Nonetheless, adherence to this principle promotes "the central policy underlying contract law, that of construing contracts so as to effectuate the parties' intentions...." *Id.* at 991; *see also State Farm*, 851 P.2d at 166–67; *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236, 240 (Colo.1992).

■ The duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time. *Hubbard Chevrolet Co. v. General Motors Corp.*, 873 F.2d 873, 876 (5th Cir.), *cert. denied*, 493 U.S. 978, 110 S.Ct. 506, 107 L.Ed.2d 508 (1989); Burton II, *supra*, at 501. The covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party. *See Hubbard Chevrolet Co.*, 873 F.2d at 877. However, it will not contradict terms or conditions for which a party has bargained. *Id.*

■ The concept of discretion in performance "refers to one party's power after contract formation to set or control the terms of performance." Burton II, *supra*, at 501. Discretion occurs when the parties, at formation, defer a decision regarding performance terms of the contract. *Id.* Generally, the good faith performance doctrine may be used to protect a "weaker" party from a "stronger" party. Weakness and strength in this context, however, do not refer to the relative bargaining power of the parties. One commentor explained:

Good faith performance cases typically involve arm's-length transactions, often between sophisticated business persons. The relative strength of the party exercising

discretion typically arises from an agreement of the parties to confer control of a contract term on that party. The dependent party then is left to the good faith of the party in control.

Burton I, *supra*, at 383–84.

■ Under the agreements, Amoco retained discretion to modify the monthly rental amount. The dealers depended upon the good faith of Amoco in setting the rental terms. Although the parties established specific rental figures at contract formation, they also decided to allow Amoco to modify rental terms. By allowing Amoco to adjust the rental terms the parties, in effect, left these future provisions open. The open rental terms required the dealers to depend upon Amoco's good faith. The general rule implying the covenant in every contract, combined with the specific discretion regarding rental terms, created a duty of good faith and fair dealing for Amoco.

■ Whether a party acted in good faith is a question of fact which must be determined on a case by case basis. Testimony at trial revealed that, in addition to being charged eight percent of the value of the land and capital assets, the dealers were charged an additional amount for the service bays. The record also reflects that Amoco was aware of the double charging. However, during and after contract negotiations, Amoco never disclosed the implications of its IVR calculations. Evidence shows that the additional charge was not disclosed to the dealers until 1988. That evidence also suggests that the dealers never agreed to be charged twice for any goods or services under the lease agreements. The dealers were justified in expecting that, in determining the appropriate rent, Amoco would not charge double for any one element of the calculation. That is, although the dealers left the rental calculation to Amoco's discretion, they presumably would not have signed the agreements had they known Amoco would charge a duplicate amount for service bays.

■ The trial court properly instructed the jury regarding the implied covenant of good faith and fair dealing. The trial court informed the jury that "Colorado law provides that each contract has an implied covenant that parties shall act in good faith and deal fairly." The trial court further instructed the jury "that the law requires each party to a contract to act in such a manner that each party will attain their reasonable expectations under the contract." The evidence at trial supported the jury's finding that, by duplicate charging, Amoco did not perform the contracts in accordance with the dealers' reasonable expectations. Considering its acknowledgment of franchisor-franchisee interdependence, the jury could have concluded that Amoco breached the implied covenant of good faith and fair dealing. On review, we will not disturb a properly instructed jury's findings of fact.

## B

■ Amoco asserts that the good faith covenant cannot be implied because the agreements stated that there were no implied covenants. The court of appeals disagreed with Amoco, holding that because an implied covenant of good faith and fair dealing is implied at law in every contract, the provision precluding implied covenants did not prevent recovery in this case. We agree.

■ The covenant of good faith and fair dealing exists in every contract to enforce the reasonable expectations of the parties. The merger and integration clauses do not permit Amoco to breach the implied covenant of good faith and fair dealing by duplicate charging. The reasonable expectations of the parties remain vital considerations in every contract. *See Simon*, 842 P.2d at 240. The record supports the jury's conclusion that Amoco breached its implied covenant of good faith and fair dealing.

## III

### *Economic Pressure*

Amoco contends that the court of appeals erred by creating the new tort of "economic pressure." According to Amoco, a supplier's lawful retail price competition with its independent distributors does not subject that supplier to liability in tort. We agree.

In the case before us, the dealers alleged that Amoco increased the costs to the dealers and sold products to its company operated stations at deflated prices. The dealers alleged that Amoco acted with the intent to move customers from dealers' stores to company operated stations. The jury awarded eight dealers $921,844 in emotional distress damages for tortious interference with prospective business relationships.

Amoco appealed, contending that the dealers had not made out a prima facie case of tortious interference. The court of appeals held that although "competition and an economic interest of seeking to acquire business are not usually improper interference ... economic pressure may be." *Ervin*, 885 P.2d at 254 (citing Restatement (Second) of Torts § 767 cmt. c (1979)). The court of appeals affirmed the trial court's rejection of Amoco's defenses of legal justification and absolute privilege as to the tortious interference claim. *See id.* at 254–55. Amoco now argues that the court of appeals erroneously adopted a new tort of "economic pressure" for legal price competition.

### A

 Colorado recognizes the tort of intentional interference with a prospective business relation. *Dolton v. Capitol Fed. Sav. & Loan Ass'n*, 642 P.2d 21, 23 (Colo. App.1981). The Restatement (Second) of Torts § 766B (1979) provides:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Tortious interference with a prospective business relation requires a showing of intentional and improper interference preventing formation of a contract. *Dolton*, 642 P.2d at 23. Comment c of section 766B notes:

> The expression, prospective contractual relation, is not used in this Section in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation.

Restatement (Second) of Torts § 766B cmt. c (1979).

 When a customer utilizes a dealer's products or services, the relation is transactional and is not "reduced to a formal, binding contract." Rather, by purchasing products or services from a particular service station, a customer confers an economic benefit upon the dealer, but does not establish a multi-transactional, continuing contractual relationship. The benefits that flow to the dealer constitute "quasi-contractual or other restitutionary rights." The relationship between potential customer and dealer complies with the definition of prospective contractual relation used in section 766B.

Section 767 of the Restatement sets forth seven factors used to determine whether there has been an improper interference with contractual relations. *Id.* § 767; *see Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.*, 690 P.2d 207, 210 (Colo.1984). Section 767 provides:

> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

Restatement (Second) of Torts § 767 (1979). Comment a explains that the interference must be both intentional and improper. *Id.* § 767 cmt. a. The comment further explains that the weight carried by these factors may vary considerably, and the determination of whether the interference is improper may also vary. *Id.* The trial court properly instructed the jury on the elements of section 767.

■ Comment c of section 767 discusses a variety of behavior which may establish that the nature of the actor's conduct is improper and, as a consequence, actionable. Comment c provides:

> *Economic pressure.* Economic pressure of various types is a common means of inducing persons not to deal with another, as when A refuses to deal with B if B enters into or continues a relation with C, or when A increases his prices to B or induces D not to deal with B on the same condition.... The question whether this pressure is proper is answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.

Under the Restatement, "economic pressure" is one method of inducing a person not to deal with another. "Economic pressure" does not exist as an independent tort. Rather, it constitutes one potential element that might affect the evaluation of the first factor of section 767. The court of appeals used the term "economic pressure" to signify Amoco's improper interference with potential contractual relations. However, the court of appeals incorrectly concluded that the existence of economic pressure alone requires a conclusion that Amoco committed a tortious interference with the dealers' prospective contractual relations.

### B

Amoco maintains that it engaged in legitimate business competition, and its behavior did not constitute improper conduct under section 767. Amoco correctly notes that the specific language of the Restatement (Second) of Torts § 768 supplants the generalizations of section 767. *Id.* § 767 cmt. a; *see also Memorial Gardens, Inc.,* 690 P.2d at 210 n. 7 ("These general considerations ... [of section 767] are supplanted by the specific applications of the rule to competitors found in section 768 of the Restatement."). Section 768 provides:

> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other.
>
> (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Section 768 "differentiates between interference with an existing contract ... and interference with a prospective contractual relation." Restatement (Second) of Torts § 768 cmt. a (1979) (citations omitted); *see also Memorial Gardens, Inc.,* 690 P.2d at 211 ("The Restatement provides less protection for contracts terminable at will because an interference with a contract terminable at will is an interference with a future expectancy, not a legal right."). If the conditions of subsection (a) through (d) are met, competition does not constitute improper interference with a prospective contractual relation. Restatement (Second) of Torts § 768 cmt. a (1979). The comment states that "[i]f one party is seeking to acquire a prospective

contractual relation, the other can seek to acquire it too." *Id.*

A defendant will be liable for tortious interference with a plaintiff's prospective contractual relations if a defendant intentionally and *improperly* interferes with such relationships. *Occusafe, Inc. v. EG&G Rocky Flats, Inc.,* 54 F.3d 618, 622 (10th Cir.1995). However, a plaintiff may not sue a competitor, *qua* competitor, for intentional interference with a prospective business relation. *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.,* 690 P.2d 207, 210–11 (Colo.1984).

Comment e delineates the "predatory means discussed in § 767, Comment *c*, physical violence, fraud, civil suits and criminal prosecutions" as "wrongful means" under section 768. Restatement (Second) of Torts § 768 cmt. e (1979); *see also* William H. Prosser, et al., *Prosser and Keaton on the Law of Torts* § 130, at 1013 (5th ed. 1984) (discussing various competitive means a defendant may employ without incurring liability). However, an "actor may use persuasion and he [or she] may exert limited economic pressure" without engaging in wrongful means. The rule stated in section 768 "rests on the belief that competition is a necessary or desirable incident of free enterprise." Restatement (Second) of Torts § 768 cmt. e (1979). Nowhere do the dealers allege, much less present evidence of, Amoco's use of physical violence, fraud, or civil or criminal prosecution to compete with the dealers within the dual distribution scheme.[6]

Amoco engaged in permissible competition. It had a dual distribution system in place, whereby it sold products through independent dealers and company operated stations. The leases were for a term of one to three years, and were terminable by the dealers at any time and by Amoco upon breach of the agreement by the dealers or upon other specified grounds. The IVR method of calculating rent payments by the dealers was itself developed because the prior system created what Amoco believed was a disincentive to the dealers to sell more products and Amoco intended to encourage the dealers to sell its products. Amoco entered into the lease agreements with the dealers from a business perspective, intending to make money.

Amoco's competitive efforts were not wrongful. Amoco's purpose was to increase its own profits from all stations, not to interfere intentionally and improperly with the dealers' relationships with their customers.

Amoco's breach of the covenant of good faith and fair dealing does not translate into liability for tortious interference. These concepts represent separate legal constructs and are intended to remedy different wrongs. Breach of one does not necessarily constitute violation of the other. In this case, double charging, although a breach of the covenant, is not, without more than the dealers have established, a wrongful means under section 768(b).

Competition necessarily assumes, and is predicated upon, economic pressure. The record does not contain evidence that Amoco intended to finance its company operated stations with the profits it made from double

---

6. Other jurisdictions recognize the limited definition of wrongful means. *See, e.g., Occusafe,* 54 F.3d at 618; *R–G Denver, Ltd. v. First City Holdings, Inc.,* 789 F.2d 1469, 1476 (10th Cir.1986); *see also Amerinet, Inc. v. Xerox Corp.,* 972 F.2d 1483, 1507 (8th Cir.1992) ("'Wrongful means,' as those words are used in Restatement Section 768(b), 'refer[ ] to means which are intrinsically wrongful—that is, conduct which is capable of forming the basis of liability for the actor.'") (quoting *Conoco, Inc. v. Inman Oil Co.,* 774 F.2d 895, 907 (8th Cir.1985)), *cert. denied,* 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993); *Great Escape, Inc. v. Union City Body Co., Inc.,* 791 F.2d 532, 543 (7th Cir.1986) (holding that there must be something "illegal" about the means employed—intimidation is not sufficient);

*DP–Tek, Inc. v. AT & T Global Information Solutions Co.,* 891 F.Supp. 1510, 1523 (D.Kan.1995) ("[T]he proper test for whether conduct qualifies as improper means should be whether the conduct itself is capable of forming the basis of liability for the actor."); *Soap Co. v. Ecolab, Inc.,* 646 So.2d 1366, 1370 (Ala.1994) (listing physical violence, fraud, civil suits, and criminal prosecutions as wrongful means); *Downey Chiropractic Clinic v. Nampa Restaurant Corp.,* 127 Idaho 283, 286, 900 P.2d 191, 194 (1995) (listing conduct constituting wrongful means as conduct wrongful by reason of a statute or regulation, a recognized rule of common law, an established standard of a trade or profession, violence, threats, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood).

charging the dealers. Also, the record does not support a finding that Amoco intended to put the dealers out of business. However, even assuming that some such inferences were available to the jury, we conclude that Amoco's actions did not constitute wrongful means under section 768(b). Because the record does not support the jury's findings, we reverse the court of appeals.

## IV

### Petroleum Marketing Practice Act Preemption

Amoco next contends that the holding of the court of appeals decision relating to the breach of good faith and fair dealing directly conflicts with the preemptive provisions of the Petroleum Marketing Practices Act, 15 U.S.C. § 2806 (1988) (PMPA). We disagree.

### A

Under the Supremacy Clause of the United States Constitution, federal law may preempt state legislation [7] governing the same subject matter. *See* U.S. Const. art. VI, cl. 2; *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986); *Mobil Oil Corp. v. Virginia Gasoline Marketers & Automotive Repair Ass'n, Inc.,* 34 F.3d 220, 224 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995); *Banner Advertising, Inc. v. People ex rel. State,* 868 P.2d 1077, 1080 (1994). Preemption occurs if Congress expressly states its intent to preclude state regulation of a subject. *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 368, 106 S.Ct. at 1898; *Mobil Oil Corp.,* 34 F.3d at 224; *Banner Advertising, Inc.,* 868 P.2d at 1080. In the absence of express congressional intent, "state law is pre-empted if that law actually conflicts with federal law ... or if

federal law ... thoroughly occupies a legislative field...." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (citations omitted); *see also Banner Advertising, Inc.,* 868 P.2d at 1080. Also, federal provisions must be construed "in 'light of the presumption against the preemption of state police power regulations." *Cipollone,* 505 U.S. at 518, 112 S.Ct. at 2618; *see also Banner Advertising, Inc.,* 868 P.2d at 1080–81.

### B

■■■ The PMPA's primary purpose is to provide a uniform body of law and "to protect petroleum franchisees from arbitrary or discriminatory terminations and nonrenewals." *Mobil Oil Corp.,* 34 F.3d at 223 (citing S.Rep. No. 731, 95th Cong., 2d Sess. 15 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 874.) The PMPA provides:

> To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806(a) (1988). By its express language, the statute preempts only those

---

**7.** Amoco does not contend that the PMPA preempts a particular state statute or regulation. However, the PMPA " 'provides for preemption of *all* state law inconsistent with the PMPA. The language in section 2806(a) makes clear the PMPA *was intended to preempt all state law* with respect to termination of a petroleum franchise.' " *Simmons v. Mobil Oil Corp.,* 29 F.3d 505, 511 (9th Cir.1994) (quoting *In re Herbert,* 806 F.2d 889, 892 (9th Cir.1986)). In *Simmons,* the state law claims involved were breach of the

covenant of good faith and fair dealing in both contract and tort and constructive fraud. *Id.* at 511–12; *see also Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (construing Federal Cigarette Labeling and Advertising Act of 1965 and its successor, the Public Health Cigarette Smoking Act of 1969, and determining whether various state law claims, including common law damages actions, should be preempted).

state laws that apply to franchise terminations or nonrenewals. *Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 305 (2d Cir.1986); *see also Simmons v. Mobil Oil Corp.*, 29 F.3d 505, 512 (9th Cir.1994) ("Those ... state law claims that do not implicate ... [a] termination or nonrenewal of the franchise ... are not preempted by 15 U.S.C. § 2806(a).").

Congress did not intend "to preempt all state regulation through passage of the PMPA." *Esso Standard Oil Co. v. Department of Consumer Affairs*, 793 F.2d 431, 435 (1st Cir.1986); *see also Bellmore*, 783 F.2d at 304 ("The PMPA neither expressly nor impliedly preempts all state law relating to any aspect of the termination or non-renewal of petroleum franchises."); *Ted's Tire Service, Inc. v. Chevron U.S.A., Inc.*, 470 F.Supp. 163, 165 (D.Conn.1979) ("The ... [PMPA] does not preempt all state laws regulating petroleum franchises...."). The framers of the PMPA intended "to create a uniform system of franchise termination, not a uniform system of contract law." *O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 593 (3d Cir.1989).

The dealers' claims are not preempted in the present case because they do not implicate Amoco's termination or nonrenewal of the franchises. *See Simmons*, 29 F.3d at 512. The dealers challenge substantive provisions of the contracts and Amoco's pricing conduct, which occurred during the term of the contracts. *Patterson v. McLean Credit Union*, 491 U.S. 164, 176–80, 109 S.Ct. 2363, 2372–74, 105 L.Ed.2d 132 (1989) (distinguishing postformation conduct from behavior during initial formation of contract). Allowing the dealers to pursue their state law claims does not create substantive rights that would not exist under the PMPA. *See Mobil Oil Corp.*, 34 F.3d at 224–25.

The statutory language and the presumption against preemption prevent us from finding a state-federal conflict because of a "fortuitous and attenuated application" of the PMPA. *See Exxon Corp. v. Georgia Ass'n of Petroleum Retailers*, 484 F.Supp. 1008, 1018 (N.D.Ga.1979), *aff'd sub nom. Exxon v. Busbee*, 644 F.2d 1030 (5th Cir.), *cert. denied*, 454 U.S. 932, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981); *see also Mobil Oil Corp.*, 34 F.3d at 228 (Ervin, C.J., dissenting) ("Unlike the ma-

jority, I expressly do not think that the statute intended to void any state law provision that indirectly affects the termination or nonrenewal of the [franchise] relationship...."); *Bellmore*, 783 F.2d at 305 ("It would be contrary to the Congressional purpose for this court to read the statute expansively, beyond the intended limits of the PMPA, and to find a conflict between state and federal law resulting in the preemption of a state statute in areas that Congress left to the control of the states."). Although Amoco's practices had an attenuated affect on the dealers' ability to remain viable business entities, they did not directly impact the termination or nonrenewal of the franchises. Because the dealers' state law claims address substantive provisions and behavior that did not involve termination or nonrenewal, they are not preempted by the PMPA.

## V

### *Conflict with Antitrust Laws*

Because we reverse the court of appeals' holding regarding tortious interference with prospective business relations, we need not address this issue.

## VI

Accordingly, we affirm in part, reverse in part, and remand to the court of appeals with directions that it return the case to the trial court with instructions that damages be recalculated.

VOLLACK, C.J., concurs in part and dissents in part, and MULLARKEY, J., joins in the concurrence and dissent.

ERICKSON, J., does not participate.

Chief Justice VOLLACK concurring in part and dissenting in part:

The majority holds that the petitioner, Amoco Oil Company (Amoco), breached an implied covenant of good faith and fair dealing with the respondents, several of its Colorado dealers. The majority then reverses the court of appeals' holding that Amoco tortiously interfered with the Dealers' pro-

spective business relationships by applying "economic pressure" to those relationships.

I dissent from the portion of the majority's opinion that holds that the implied covenant of good faith and fair dealing may be utilized to limit or rewrite the rent and rent modification provisions of the lease agreements in this case. I concur with the majority's holding that liability against Amoco for tortious interference is precluded by the principle that competitors who do not engage in wrongful means are shielded from liability for tortious interference.

## I.

Amoco is in the business of selling gasoline. It does so through a dual distribution scheme whereby (1) Amoco sells its gasoline to its independent dealers, including the respondents, who then resell it to the public, and (2) Amoco sells gasoline directly to the public through its company owned and operated stations. The respondents in this case are a group of sixteen Amoco-branded service station dealers (the Dealers).

Amoco leases gasoline stations to the Dealers and is thus the Dealers' landlord. Each Dealer executed a written lease agreement with Amoco for a term from one to three years. Each lease agreement specifies the monthly rent that the Dealer agreed to pay Amoco.[1] The leases also contain a modification of rental provision in which Amoco reserved the right to modify the amount of monthly rent of leases for more than one year.[2] The provision only allows Amoco to increase the rent on the anniversary of the commencement of the lease, and only with ninety days' notice to the lessee. The lease also contains an integration, cancellation and merger clause.[3]

From 1985 forward, Amoco used what it called its "Investment Value Rent program" (IVR program) to calculate the amount of rent it charged each of its lessees. Through this program, Amoco calculated the amount of rent based on the value of the service station. The IVR program was not any part of the lease agreements, nor did the lease agreements contain any other indication of how the rent was calculated.

On June 20, 1988, the sixteen respondents filed the instant action against Amoco, alleging, *inter alia*, breaches of contract and tortious interference with prospective business relationships. In October of 1990, the jury found against Amoco for breaching an implied covenant of good faith and fair dealing and for tortious interference. The district court subsequently entered judgment against Amoco for more than $2.5 million.

On appeal, the court of appeals affirmed the judgment of the district court and verdict of the jury. The court held, *inter alia*, that a reasonable jury could have found that Amoco breached its implied covenant of good faith and fair dealing to the Dealers because the Dealers submitted evidence that Amoco used redundant charges when calculating the Dealers' monthly rent through the IVR pro-

---

1. These provisions uniformly stated: "Rental. Lessee shall pay to Lessor as rent for the Premises, the sum of $[varying amounts] per month during the term of this Lease...."

2. This provision states:
 Modification of Rental. In the event that the original term of this Lease is for more than one year, each year of said term Lessor reserves the right to modify the monthly rental specified above to conform with Lessor's established policy rental in effect for this type facility as of each anniversary date of the commencement of the term by giving Lessee at least ninety (90) days' advance written notice of such changed rental, and Lessee shall have the right at any time during said ninety (90) day period to terminate this Lease upon giving Lessor fifteen (15) days' notice in writing.

3. This provision states:

Entire Agreement. This Lease cancels and supersedes all prior written and unwritten agreements and understandings between the parties pertaining to the matters covered in this Lease. No obligations, agreement [sic] or understandings shall be implied from any of the terms and provisions of this Lease, all obligations, agreements and understandings with respect to the subject matter hereof being expressly set forth herein. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this Lease. No modification or waiver of, addition to, or deletion from the terms of this Lease shall be effective unless reduced to writing and signed by Lessee and a representative of Lessor authorized to execute this Lease.

gram. The court of appeals also rejected Amoco's assertion that the merger and integration clause precluded application of the implied covenant of good faith and fair dealing. The court also held that the trial court did not err by allowing the jury to decide that Amoco had applied economic pressure to the Dealers, thereby tortiously interfering with the Dealer's prospective business relationships. Finally, the court rejected Amoco's affirmative defenses that the imposition of liability against Amoco for breach of an implied covenant of good faith and fair dealing violates the preemption provisions of the Petroleum Marketing Practices Act, and that imposition of liability against Amoco for tortious interference conflicts with federal and state antitrust law. We subsequently granted Amoco's petition for certiorari.

## II.

Although I agree with the majority that, in Colorado, the law imposes a duty of good faith and fair dealing upon all contracts, I disagree with the majority's conclusion that it was proper to allow the jury to use this principle to materially rewrite unambiguous express provisions of the lease agreements between Amoco and the Dealers. I would hold that the trial court acted improperly when it allowed the jury to (1) relieve the Dealers from the obligation to pay their rents and preclude Amoco from collecting those rents, (2) substitute the express rent terms in the lease agreements with lower amounts fashioned by the jury, and (3) delete entirely a paragraph barring implied covenants and modifications absent written agreement of both parties.

Written contracts that are complete and free from ambiguity will be enforced according to the plain language of their terms. *In Re May*, 756 P.2d 362, 369 (Colo.1988). Thus, when the contract is unambiguous, extrinsic evidence may not be employed to interpret the contract. *Barnes v. Van Schaack Mortgage*, 787 P.2d 207, 209 (Colo. App.1990). While it is true that every contract contains an implied duty of good faith

and fair dealing, *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1362 (Colo.App.1994) (citing Restatement (Second) of Contracts § 205 (1981)), the essence of the implied covenant of good faith and fair dealing is the protection of the reasonable expectations of the parties. *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1267 (10th Cir.1988) (citing E. Allan Farnsworth, *Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code*, 30 U.Chi.L.Rev. 666, 670 (1963)). In *Big Horn*, the Court of Appeals for the Tenth Circuit explained:

> Although good faith is generally applicable to all contract provisions, "it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case *the issue of good faith is irrelevant.*" ... In such a case the reason for invoking the provision is irrelevant. The reason may be purely a whim or caprice; all that matters is that proper notice is given. The rationale behind [this rule] is that the parties expressly contracted for the unconditional right and thus they cannot reasonably expect any special implied protection from terminating the contract other than the proper written notice.

*Big Horn*, 852 F.2d at 1267–68 (quoting *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1153 (D.C.Cir.1984) (Scalia, J.)) (emphasis added); *accord Flight Concepts Ltd. Partnership v. Boeing Co.*, 38 F.3d 1152, 1157 (10th Cir. 1994) ("Although the doctrine is generally implied for all contract provisions, it is irrelevant where the contract is drawn so as to leave a decision to the 'uncontrolled' discretion of one of the parties."); *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 729 (10th Cir.1991).

I would apply the same reasoning employed by the Tenth Circuit in *Big Horn* to the instant case and hold that the implied covenant of good faith and fair dealing may not be utilized to limit the rent or modification provisions of the lease agreements in this case.[4] The modification clause in the

---

4. Although § 4–1–203, 2 C.R.S. (1992), states that "[e]very contract or duty within this title imposes an obligation of good faith in its perfor-

mance or enforcement," § 4–1–102(3), 2 C.R.S. (1992), provides that "parties may by agreement determine the standards by which the perfor-

lease agreements gives Amoco absolute discretion to modify a dealer's rent so long as Amoco gives adequate notice to that dealer. The reason for the modification is thus entirely irrelevant; the only duty imposed on Amoco by the express terms of the contract is to give notice to a dealer before modifying the rent.[5] The Dealers and Amoco, as sophisticated businesspersons, expressly agreed to a contract term that allowed Amoco unfettered discretion in modifying the rent. The Dealers should not now be permitted to maintain the untenable position that they did not reasonably expect Amoco to exercise this legal right under the lease agreements.

To hold otherwise would allow the Dealers to use the jury as a tool to renegotiate the lease agreements after their legal formation. This would cut off Amoco's right to enter into any legal contract and to exercise its lawful rights thereunder. Here, Amoco exercised its right to offer lease property and equipment to the Dealer. Amoco had the right to make the offer on any terms it desired, whether subject to negotiation or not. Amoco was not legally bound to extend the offer, much less negotiate its terms. The Dealers

then had the option, at their complete discretion, to accept or reject Amoco's offer. Once the Dealers accepted the offer, an express contract was formed, the rent and modification terms conveying absolute discretion to Amoco. In light of this unfettered discretion, I would hold, as a matter of law, that the Dealers could have had no reasonable expectation that Amoco would not exercise its legal right to modify the rent as provided in the lease agreement. I would thus hold that the implied covenant of good faith and fair dealing may not be utilized to limit the rent or modification provisions of the lease agreements in this case.[6]

### III.

Because I disagree with the utilization of the implied covenant of good faith and fair dealing to rewrite the rent and rent modification provisions of the lease agreements in this case, I respectfully dissent from part II of the majority's opinion. I concur with the majority's holding that liability against Amoco for tortious interference is precluded by the principle that competitors who do not engage in wrongful means are shielded from liability for tortious interference.

---

mance of [good faith] is to be measured if such standards are not manifestly unreasonable." By imposing no limitation on Amoco's right to modify the rent, the parties in the instant case contracted for a standard of absolute discretion with regard to that provision. The reasonable expectations of the parties are thus guided by that standard as provided by § 4–2–102.

**5.** The Dealers do not allege that Amoco failed to give them proper notice.

**6.** Even if I agreed that utilization of the implied covenant of good faith and fair dealing was appropriate in this case, I would hold that the trial court improperly allowed the jury to use the covenant to reform express provisions of the lease agreements. In *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359 (Colo.App.1994), the court of appeals stated:

[T]he duty of good faith and fair dealing does not obligate a party to accept a material change in the terms of the contract or to assume obligations that vary or contradict the contract's express provisions. Nor does the duty of good faith and fair dealing inject substantive terms into the parties' contract. Rather, it requires only that the parties per-

form in good faith the obligations imposed by their agreement.

... When one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached.

*Id.* at 1363 (citations omitted); *see also Abbott v. Amoco*, 249 Ill.App.3d 774, 189 Ill.Dec. 88, 97–98, 619 N.E.2d 789, 798–99 *appeal denied*, 153 Ill.2d 557, 191 Ill.Dec. 616, 624 N.E.2d 804 (1993).

Applying the above reasoning to the case at bar, I would hold that the trial court erred by allowing the jury to (1) relieve the Dealers from the obligation to pay their rents and preclude Amoco from collecting those rents; (2) substitute the express rent terms in the lease agreements with lower amounts fashioned by the jury; and (3) delete entirely a paragraph barring implied covenants and modifications absent written agreement of both parties. By doing so, the trial court obligated Amoco to accept material changes in the terms of the contract and to assume obligations contradictory to the express provisions of the lease agreements. This was in direct contravention of the *Wells Fargo* principles articulated above and I would reverse on that basis.

I am authorized to say that Justice MUL-LARKEY joins in this concurrence and dissent.