Hershell Don SIMMONS; Nancy Louise Simmons, his wife, Plaintiffs–Appellants,

v.

**MOBIL OIL CORPORATION,** Defendant–Appellee.

No. 92–16092.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted November 4, 1993.

Decided July 15, 1994.

Ronald W. Meyer, Phoenix, AZ, for plaintiffs-appellants.

N. Warner Lee and John C. Lemaster, Ryley, Carlock & Applewhite, Phoenix, AZ, for defendant-appellee.

Before: ALARCON, LEAVY and KLEINFELD, Circuit Judges.

LEAVY, Circuit Judge:

In 1976, the appellant Hershell Don Simmons ("Simmons") entered into a franchise agreement with Mobil Oil Corporation ("Mobil") to lease a gasoline service station in Peoria, Arizona, and to buy Mobil petroleum products to be retailed under the Mobil trademark. Simmons operated the station under three-year franchises with Mobil that were renewed in 1979, 1982, and 1985.

On January 4, 1988, Mobil gave Simmons notice that his existing lease and retail dealer contract would expire on August 1, 1988. Mobil stated that they would not be renewed because it desired to make changes or additions to the relationship with Simmons. Mobil included in its notice an expression of hope that a new agreement could be reached and thereby renew the franchise relationship.

On February 2, 1988, Mobil presented Simmons with a new Retail Dealer Contract and a new service station lease which contained an increase in rent. The effective date for the contract and lease was August 2, 1988. On March 30, 1988, Simmons executed both the dealer contract and the lease. At the same time, Simmons wrote to Mobil: "Although I am agreeing to accept the new lease and contract, I do it with reluctancy and under protest."

Simmons operated under the new Lease and Contract for over a year. On January 1, 1990, Simmons wrote to Mobil that he was exercising his right to terminate the service station lease, effective April 10, 1990. In

April 1990, Simmons abandoned the service station.

On June 1, 1990, Simmons filed this action against Mobil, which included a claim of termination of the franchise in violation of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2806 (1982), along with various state claims. The district court entered summary judgment in favor of Mobil. Simmons alleged that Mobil forced him out of business by: (1) imposing an onerous rent on Simmons; (2) opening five service stations in Peoria that Mobil operated directly; (3) engaging in "predatory pricing;" and (4) failing to maintain Simmons' service station in the normal manner under the franchise agreement. The state law claims before us are breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and constructive fraud.

The district court concluded Mobil had not violated the PMPA because Simmons, not Mobil, had terminated the franchise and Simmons failed to present evidence of predatory pricing as that term is used in antitrust law. The district court also held that the PMPA preempted the state law claims.

## DISCUSSION

### I. *Whether 15 U.S.C. § 2805(a) Bars Simmons' Claim*

█ PMPA claims must be brought within one year after the later of: (1) the date of termination of the franchise or nonrenewal of the franchise relationship, or (2) the date the franchisor fails to comply with the specific requirements of the PMPA. 15 U.S.C. § 2805(a); *DuFresne's Auto Serv., Inc. v. Shell Oil Co.*, 992 F.2d 920, 924 (9th Cir. 1993). "This means that the one-year period begins to run on the date of the statutory

violation, or the end of the franchise, whichever is later." *Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442 (8th Cir.1990). Simmons argues that his franchise was terminated. Thus, we are concerned only with "the date of termination of the franchise or nonrenewal of the franchise relationship." [1]

At oral argument, Simmons maintained that Mobil's "coercive" termination of the franchise occurred in April of 1990, when all the events had "crystallized," the violation was "complete," and he ran out of money. However, the record does not support this argument.

Count Three of the Second Amended Complaint alleges that Mobil violated the PMPA "by devising a coercive rent structure coupled with predatory pricing by company operated stations in the same marketing area, which forced a termination of the franchise *relationship*." (Emphasis added.) Simmons also alleges in the Second Amended Complaint that *he* terminated the franchise relationship: "The Plaintiffs had to use savings and other resources in order to maintain their service station. In the spring of 1990 they were broke *and had to terminate the franchise relationship*." (Emphasis added.) However, Simmons' own action in abandoning the service station cannot be the termination he complains of. Simmons' real complaint is about Mobil's alleged bad faith conduct in 1988 when it refused to operate under the previous franchise relationship.

The record demonstrates that Simmons alleges the bad faith imposition of conditions on August 2, 1988, and other conduct by Mobil that changed the existing franchise relationship. Chief among the conditions was the imposition of two and one-half times the previous rent.

---

1. We have explained the distinction between a "franchise" and a "franchise relationship:"

The PMPA plainly contemplates that franchisors will have substantial flexibility in changing the terms of a franchise upon renewal. Thus, section 2801 defines two separate concepts: the 'franchise,' consisting of a specific contract between a franchisor and a franchisee, 15 U.S.C. § 2801(1); and the 'franchise relationship,' consisting of the mutual obligations and responsibilities between the parties arising from the marketing of motor fuel under a franchise. Under the PMPA, the franchisor has (absent specific cause) an obligation to renew only the franchise relationship, *not* the particular franchise. Indeed, section 2802(b)(3)(A) contemplates the possibility of material changes in the terms of the franchise, allowing the franchisor to end the relationship if agreement cannot be reached with respect to such changes.

*Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1391 (9th Cir.1986) (citations and footnotes omitted).

On January 4, 1988, Mobil sent Simmons a letter regarding a "Notice of Intent to Change Terms and a Non-renewal of Existing Lease and Contract." The letter reads as follows:

The Service Station Lease and Retail Dealer Contract between us, each dated July 8, 1985, covering the premises at 8345 Grand Avenue, Peoria, Arizona 85345 will expire by their terms on August 1, 1988. They will not be renewed as Mobil desires to make changes or additions to the *relationship* with you.

We hope to work out *mutually acceptable* new agreements with you and thereby *renew our franchise relationship.* We expect in the near future to submit to you, for your consideration, a proposed new Lease and Contract.

If agreement is reached between you and Mobil, the new Lease and Contract will become effective August 2, 1988, and will have an increase in rental. The specifics of the changes will be contained in the new Lease and Contract to be submitted to you in the near future.

If we are unable to conclude a new Lease and Contract within 30 days after their submission to you, our offer to enter into a new Lease and Contract with you shall be automatically withdrawn and you will be expected to vacate and surrender the premises to us on or before the expiration date of your current Lease and Contract. *Our franchise relationship will also terminate on that date.*

Attached hereto is a copy of the Department of Energy (D.O.E.) Summary of the Federal Petroleum Marketing Practices Act.

(Emphasis added.)

At that time, Simmons knew his lease and contract were going to change, and that the new franchise would ruin him financially. Benjamin Neal Perkins was a marketing representative for Mobil and an accountant who specialized in performing accounting and consulting services for dealers in the Phoenix area, including Simmons. With respect to Mobil's proposed 1988 franchise agreement, Perkins stated:

I had never seen a rent increase of that magnitude within that given period of time unless there was great justification for it such as a rebuilt station, new facilities or some other factor in the market that justified upping the rent.

So immediately I became alarmed and started going through some of the numbers with Mr. Simmons and quickly determined that *he could not live with that rent with the market turning as it was.* And in 1987 with the new stations that were being built in his general area, we could see that ... in that period of time of '87 it was a turn. Things had changed. And they didn't reflect on the numbers so much immediately, but we knew from what was happening on the street with Arcos going in and with Mobil branding the Circle K's, with some changes in the market, that ... there was going to be no justification for that type of rent.

Deposition of Benjamin Neal Perkins, April 26, 1991, at 130 (emphasis added). Mr. Perkins made it clear that he and Simmons had gone over the alarming figures *before* Simmons signed the new contract and lease:

And there was just no way that I could see that that was going to work unless it was brought down to a more reasonable rent. And I didn't have any other dealers ... [who had] leases [that] had that much rent for one location.

Q. Okay. Do you know when you penciled out those [rent figures] that you could live with?

A. No.

Q. Okay. But it was over this—

A. It was during the period of time that we were discussing this, and that was *before* Don Simmons had signed the lease and agreed to it.

*Id.* at 137 (emphasis added). Perkins personally met with Mobil on behalf of Simmons to protest the new franchise agreement, to no avail. The record also shows that Mobil refused to negotiate with Simmons:

Q. And it was your understanding that prior to the time he signed the lease, you and Mr. Simmons had worked out a range of 4,000 to 4500 a month he could live with?

A. Yes.

Q. And do you know what the result of that was?

A. My information from Simmons is that Mobil would not negotiate with him at all.

Q. Did Mr. Simmons tell you who he talked to?

A. He told me that he had tried on a number of occasions to call the area manager, the district manager. Other than that, he indicated he only talked to the marketing rep.

Perkins deposition at 140.

Although faced with: (1) an unparalleled rent increase; (2) three new Mobil service stations in his marketing area; (3) figures that demonstrated that the station unquestionably would fail under the new agreement; and (4) Mobil's refusal to negotiate at all, Simmons nevertheless signed the new lease. There is no evidence that Simmons acted unknowingly; he signed "with reluctancy and under protest." No. CIV 90–0835–PHX–CAM, Exhibits to Defendant Mobil's Statement of Facts, Tab 16 (letter of H.D. Simmons to Mobil Oil dated March 30, 1988).

■ Congress enacted the PMPA to protect "franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 874 (Senate Report). Congress sought to reduce the disparity of bargaining power between the franchisee and the franchisor and to prevent the harsh consequences of sudden and unreasonable termination. *See* 123 Cong.Rec. 10386 (1977) (remarks of Rep. Mikva). Congress also sought to prevent *coercive or unfair* franchisor practices. S.Rep. No. 95–731, 95th Cong., 2d Sess. 17, 18, *reprinted in* [1978] U.S.Code Cong. & Ad. News 873, 876–77; *Veracka v. Shell Oil Co.,* 655 F.2d 445 (1st Cir.1981).

The essence of Simmons' argument is that Mobil was not acting in good faith by imposing the new franchise agreement of August 2, 1988. The condition for renewal Simmons complains of was a drastic increase in the rent. Simmons knew he could not survive the imposition of this condition when he was competing with other Mobil-operated stations and with higher-cost Mobil products, all of which is the basis for his argument concerning economic duress. According to Simmons, this condition was imposed in bad faith, was arbitrary and discriminatory, and was a pretext for ending the franchise. His complaint states:

The franchise relationship was scheduled for renewal in 1988. Plaintiffs were tendered a lease on January 6, 1988, which was signed on or about March, 1988.

Upon information and belief, the rent for the tendered lease was based on gross profit for 1987, and was arrived at by multiplying the gross profit by 20%. The rent in the tendered lease in comparison to the previous lease, was increased approximately 2 and 1/2 times the previous rent.

At the time the Defendant, MOBIL, tendered the lease to Plaintiffs, the Defendant, MOBIL, was engaged in a program of opening service station facilities that were operated by company personnel of MOBIL, rather than by dealers such as the Plaintiffs. At the time of tendering the lease to Plaintiffs, MOBIL was in the process of planning to operate at least five company owned and operated facilities within the marketing area of the Plaintiffs. In September of 1987, a company operated facility was opened at 67th Avenue and Peoria. In October of 1987, a franchise to sell MOBIL products was given to a Circle K facility at 75th Avenue and Peoria. In January—February, 1988, a company operated facility was opened at 67th Avenue and Cactus. In the fall of 1988, a company operated facility was opened at 87th Avenue and Bell Road. In December of 1988, a company operated facility was opened at 75th Avenue and Cactus. In January of 1990, a company operated facility was opened at 83rd Avenue and Thunderbird. All of these facilities were in the marketing area of the Plaintiffs.

. . . .

The service station which was showing a profit of $50,000.00 in 1986 and 1987, resulted in a loss of over $40,000.00 for 1988 and 1989.

. . . .

The franchise—contract between Plaintiffs and Defendant, MOBIL, has an implied covenant of good faith, wherein neither party will take actions which will undermine or defeat the purpose of the franchise—contract. The Defendant, MOBIL, *breached this covenant* by conduct including, but not limited to, the following:

. . . .

(3) Devising a rent structure which was designed to prevent the Plaintiffs from making a profit *and maintaining their franchise relationship.*

Second Amended Complaint, No. CIV 90–0835–PHX–CAM, at 2–7, paras. VII, VIII, IX, XIV, XVII (emphasis added). Simmons states in his appellate brief:

1. "The only economic explanation for the course of action of Mobil is that it wanted to terminate the franchise relationship." Appellant's Opening Brief at 4–5.

2. "Mobil's conduct resulted in a forced termination of the franchise relationship. . . ." *Id.* at 5.

3. "There are factual, implied covenants in a franchise agreement. . . . Mobil pledges that it will further the franchise relationship and not take any course of action which would frustrate or terminate the franchise relationship." *Id.* at 14.

4. "Mobil cannot set the franchise fee [consisting of rent and the cost of Mobil products] to[o] high, because . . . *it would destroy the franchise relationship." Id.* at 14.

5. "Simmons does not assume that Mobil will set a franchise fee so high that it *will destroy the franchise agreement." Id.* at 14.

6. "The special relationship [between franchisor and franchisee] places an obligation on the franchisor to preserve the relationship and give the franchisee a reasonable expectation of recovering his opportunity costs." *Id.* at 18.

7. "[I]n order for Mobil to terminate Simmons it devised a program which made it economically impossible for Simmons to continue as a dealer." *Id.* at 20.

8. "The significance of the rent is that it demonstrates the intent of Mobil to terminate." *Id.* at 22.

9. "The circumstances which were causing Simmons' problem were the coercive acts of Mobil." *Id.* at 23.

10. "Cases and the legislative history clearly provide that the purpose of the PMPA was to protect a franchisee from arbitrary and discriminatory termination." *Id.* at 26.

11. "To economically coerce a termination is a violation of the PMPA." *Id.* at 27.

12. "Mobil implement[ed] a program which [was] designed to bankrupt [Simmons]." *Id.* at 28.

Examined in this context, the imposition of the new contract on August 2, 1988, is the only complaint Simmons can have under the PMPA, because it destroyed the existing franchise relationship. Any franchise relationship after August 2, 1988, was grounded in the renewed franchise. Simmons effectively alleges a bad faith imposition of conditions in a franchise agreement and the best he can muster for an argument to get around the statute of limitations is that the wrongs did not "crystallize" until he terminated in April of 1990.

Title 15 U.S.C. § 2802(b)(2)(C) sets forth the permissible ground for nonrenewal of a franchise relationship:

The occurrence of an event which is relevant to the franchise relationship and as a result of which . . . nonrenewal of the franchise relationship is *reasonable. . . .*

(Emphasis added.) Simmons implies that Mobil's action in imposing the new franchise was impermissible under the PMPA. He then complains about the fact that the conditions required for renewal produced harsh results. Consequently, the nonrenewal of his former franchise relationship at the expiration of its term destroyed Simmons' reasonable expectations as a franchisee. *Cf. Baldauf v. Amoco Oil Co.,* 553 F.Supp. 408, 414–15 (W.D.Mich.1981) ("the prospect of nonrenewal of the franchise relationship hangs over the relationship and may manifest itself during the franchise term as a means by which the franchisor may compel the franchi-

see to comply with the franchisor's ... policies."), *aff'd*, 700 F.2d 326 (6th Cir.1983). In the letter of January 4, 1988, Mobil specifically offered to renew the franchise under altered conditions and stated the consequences of failure to agree.

Section 2806(a) speaks of "nonrenewal of the franchise relationship." Given Simmons' arguments, this phrase can only mean the franchise relationship that was defined by the franchise agreement in effect before August 2, 1988. It is the nonrenewal of this relationship that Simmons complains of, because his claim arises from what he alleges Mobil did at the time of renewal.

 The PMPA must be interpreted consistent with its plain language and within its "logical boundaries." *See Humboldt Oil Co. v. Exxon Co.*, 695 F.2d 386, 389 (9th Cir. 1982). To allow Simmons to argue on the one hand that he terminated the franchise relationship in April of 1990, while on the other hand he argues that the franchise relationship was destroyed by the imposition of a new contract on August 2, 1988, is contrary to Congress's intent that there be a one-year statute of limitation from the date of the nonrenewal.

According to Simmons, his franchise relationship was destroyed on August 2, 1988. To avoid the one-year limitation period of section 2805(a), he had to file an action within one year of August 1, 1988, the "date of ... nonrenewal of the franchise relationship." 15 U.S.C. § 2805(a)(1). By the time he filed on June 1, 1990, it was too late. If Simmons had a claim it arose on August 1, 1988, not in the spring of 1990 when, as he alleges, he "had to terminate the franchise relationship."

Thus we do not reach the merits of Simmons' claim that Mobil violated the PMPA with a "coercive" termination that finally occurred in January of 1990. Instead, we conclude that the action is barred by the one-year statute of limitations in section 2805(a).

## II. *Whether Preemption Applies to Simmons' State Law Claims*

The express preemption clause of the PMPA is in section 2806(a), which states:

> To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

We have held that section 2806(a) "provides for preemption of *all* state law inconsistent with the PMPA. The language in section 2806(a) makes clear the PMPA *was intended to preempt all state law* with respect to termination of a petroleum franchise." *In re Herbert*, 806 F.2d 889, 892 (9th Cir.1986); *accord, Humboldt Oil Co. v. Exxon Co., U.S.A.*, 823 F.2d 373, 374–75 (9th Cir.1987) (per curiam) (California law on assignment is preempted by the PMPA, whose purpose is to provide a "national, uniform policy for petroleum franchise termination"), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1575, 99 L.Ed.2d 890 (1988).

We must decide whether any of the state law claims Simmons presents on appeal are inconsistent with, and therefore preempted by, the PMPA. *See Cipollone v. Liggett Group, Inc.*, —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (construing implied preemption in Federal Cigarette Labeling and Advertising Act of 1965 and its successor, the Public Health Cigarette Smoking Act of 1969, and determining whether each state law claim should be preempted); *Pride v. Exxon Corp.*, 911 F.2d 251, 257–58 (9th Cir. 1990) (deciding whether state law claim of misrepresentation is inconsistent with, and therefore preempted by, the PMPA).

The state law claims involved in the preemption issue on appeal are: breach of the covenant of good faith and fair dealing in

both contract and tort (counts one and two) and constructive fraud (count five).

In counts one and two, Simmons alleges that the rent, the opening of the Mobil-operated stations, predatory pricing, and failure to comply with the franchise agreement forced Simmons to terminate the franchise, resulting in breach of the implied covenant of good faith and fair dealing by Mobil. In count five, Simmons alleges Mobil committed constructive fraud "with an evil mind and spiteful and malicious motive" by failing to disclose material facts as required in a fiduciary relationship. The facts Simmons alleges Mobil failed to disclose are: (1) that Mobil intended to open five service stations within Simmons' marketing area; (2) that Mobil was going to engage in predatory pricing; (3) that the volume of petroleum products would drop appreciably; and (4) that Mobil would not adjust the rent.

■ Simmons' claims based on Mobil's rent structure are clearly preempted. If Simmons was dissatisfied with the rent proposed by Mobil in the August 1988 agreement, the proper remedy would have been to refuse to sign the agreement and to bring an action under the PMPA for nonrenewal of the franchise agreement. Simmons could have alleged that the rental increases were changes to the provisions of the franchise that were not made in good faith and in the normal course of business. 15 U.S.C. § 2802(b)(3)(A). Having failed to properly bring an action under the PMPA, Simmons cannot recharacterize his claim as a state law claim for breach of the covenant of good faith. State law imposes a different standard of behavior, and therefore state law claims are preempted by 15 U.S.C. § 2806. *In re Herbert*, 806 F.2d at 892.

■ However, with respect to the claims based on Mobil's opening of company-operated stores in Simmons' marketing area, using those stores to drive Simmons out of business, and failing to maintain Simmons' facility, the preemption analysis is different. Two of the stores were opened after the franchise renewal agreement took effect on August 2, 1988. The alleged "predatory pricing" by the company-owned service stations—allegedly calculated to drive Simmons out of business—took place after August 2, 1988. The claim of breach of the covenant of good faith based on these events is not covered by the PMPA preemption clause. The preemption clause applies to state laws "with respect to termination ... of any such franchise or to the nonrenewal ... of any such franchise relationship." 15 U.S.C. § 2806(a). Those of Simmons' state law claims that do not implicate Mobil's termination or nonrenewal of the franchise—i.e., those based on Mobil's conduct after August 1, 1988—are not preempted by 15 U.S.C. § 2806(a). The fact that Simmons himself eventually terminated the franchise does not preclude him from bringing a claim based on Mobil's alleged breach of the covenant of good faith.

III. *Whether Summary Judgment Was Warranted on Simmons' State Law Claims*

■ A district court's grant of summary judgment is reviewed de novo. We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Prestin v. Mobil Oil Corp.*, 741 F.2d 268, 269–70 (9th Cir.1984).

■■ Count 2 (tortious breach of the covenant of good faith) and Count 5 (constructive fraud) of Simmons' complaint have as elements the existence of a fiduciary or other "special relationship." *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 385, 710 P.2d 1025, 1040 (1985); *Walters v. First Fed. S & L Ass'n*, 131 Ariz. 321, 324, 641 P.2d 235, 238 (1982). A petroleum franchise is not generally a "special relationship." *Little Oil Co. v. Atlantic Richfield Co.*, 852 F.2d 441, 446–47 (9th Cir.1988). While there is generally a disparity in bargaining power in the franchise context, more is required. *Id.* at 447. For example, a special relationship may be deemed to exist where a contract exists for other than commercial reasons or where contract damages are likely to be inadequate. *See Burkons v. Ticor Title Ins. Co. of Cal.*, 168 Ariz. 345, 355, 813 P.2d 710, 720 (1991); *McAlister v. Citibank*, 171 Ariz. 207, 213, 829

P.2d 1253, 1259 (App.1992). Because Simmons failed to present evidence that his franchise relationship with Mobil possessed the attributes of a "special relationship," summary judgment in Mobil's favor was warranted on Counts 2 and 5.

Count 1 of Simmons' complaint asserts that Mobil violated the contractual covenant of good faith. Arizona law imposes a covenant of good faith and fair dealing in every contract. *Rawlings v. Apodaca,* 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986). "The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Id.* 726 P.2d at 569–70. We have defined a franchise in terms of three elements: "a contract to use the refiner's trademark, a contract for supply of motor fuel to be sold under the trademark, and a lease of the premises at which the motor fuel is sold." *Fresher v. Shell Oil Co.,* 846 F.2d 45, 46–47 (9th Cir.1988) (per curiam). Simmons' non-preempted allegations of Mobil's violation of the covenant of good faith are that Mobil (1) opened five company operated service stations between September 1987 and January 1990 in Simmons' marketing area, (2) sold petroleum products through these stations at prices intended to drive Simmons out of business, and (3) failed to provide agreed upon support services for Simmons' facility.

There was uncontroverted evidence that between 1987 and 1989 Mobil opened five company-operated stations in the Peoria area. But Simmons acknowledged that he knew and could expect that Mobil would open such stations. Mobil presented evidence that Peoria had become a more densely populated area between 1976, when Simmons became a Mobil dealer, and 1988. Simmons presented no evidence that Mobil's opening of the five stations was intended to undermine the value of Simmons' franchise.

Simmons presented evidence that on one occasion, August 24, 1988, one of the Mobil-operated stations sold gasoline at retail prices that were lower than the wholesale prices Mobil was charging Simmons. How-

ever, there was uncontroverted evidence that after Simmons complained, the station raised its retail prices to a level that would allow Simmons to compete. Simmons' other "predatory pricing" claims are merely that some of the company-operated stations suffered operating losses during certain time periods. This evidence is insufficient to support a conclusion that Mobil violated the covenant of good faith and fair dealing with Simmons. Simmons presented no evidence that his franchise agreement with Mobil prevented Mobil from competing with him. Nor did he present evidence that any of Mobil's pricing practices demonstrated lack of good faith. Finally, Simmons presented no evidence that Mobil failed to provide contractually required support services. The district court correctly granted Mobil's motion for summary judgment.

AFFIRMED.