Steven G. **CLARK**, Plaintiff–Appellant,

v.

**BP OIL COMPANY and Downey Oil Company, Defendants–Appellees.**

No. 96–5847.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 20, 1997.

Decided Feb. 24, 1998.

Dimitri G. Daskal (argued and briefed), Annapolis, MD, Bill W. Petty, O'Connor, Petty, Child & Boswell, Knoxville, TN, for Plaintiff-Appellant.

Howard H. Vogel (argued and briefed), O'Neil, Parker & Williamson, Knoxville, TN, Alphonse M. Alfano (argued and briefed), Bassman, Mitchell & Alfano, Chartered, Washington, DC, for Defendants-Appellees.

Before: KEITH, BOGGS, and COLE, Circuit Judges.

BOGGS, J., delivered the opinion of the court, in which KEITH, J., joined. COLE, J. (pp. 396–98), delivered a separate dissenting opinion.

## OPINION

BOGGS, Circuit Judge.

A gasoline station franchisee appeals the district court's order granting partial summary judgment in favor of BP Oil Company ("BP") and Downey Oil Company ("Downey") and remanding the remaining claims to state court in his suit alleging violations of the Petroleum Marketing Practices Act ("PMPA") and various claims under Tennessee law. We affirm.

I

In 1990, Stephen Clark began operating his BP Emerald–Mart in Lenoir City, Tennessee pursuant to a franchise agreement he had entered into with BP. Under the terms of this agreement, Clark leased the Emerald–Mart premises from BP, purchased BP-branded gasoline and petroleum products for resale to the motoring public, and he was permitted to use BP's trademark and service marks. This initial agreement expired December 31, 1991. Clark then entered into a second, substantially similar, franchise agreement with BP running from January 1, 1992 until December 31, 1994 ("the 1992 Agreement").

Pursuant to the price term of the 1992 Agreement,[1] BP charged Clark the same base price for gasoline that it charged all other dealers supplied directly by BP.[2] This

---

1. The agreement stated: "Prices for all products purchased by Dealer from BP shall be BP's price in effect at the time and place of delivery for franchised dealers. Prices for all products shall be subject to change without notice to Dealer."

2. Franchisees supplied directly by BP instead of an independent distributor of BP products are

base price was subject to downward adjustments known as "price supports." These price supports, however, were granted at BP's discretion. Clark had no right to them under the terms of the 1992 Agreement. The price supports were granted to alleviate significant local competitive pressures faced by BP direct supply dealers, such as Clark. The price supports were also used to assure that BP direct supply dealers paid a wholesale price for gasoline below the retail price charged at gas stations owned and operated directly by BP. Furthermore, BP permitted Clark and other direct supply dealers to buy on credit, although the 1992 Agreement granted BP discretion "to discontinue credit services" at any time. Clark also received promotional materials that BP was not contractually required to supply. The express terms of the agreement provided that termination and nonrenewal of the franchise were governed by the PMPA. The 1992 Agreement also contained an integration clause stating that "[t]his Agreement constitutes the entire agreement and understanding between BP and Dealer, merging and superseding all prior agreements, understandings, warranties and representations, whether oral, written, express or implied between BP and Dealer." The agreement further provided that "NO REPRESENTATIONS NOT SET FORTH IN WRITING HEREIN HAVE BEEN MADE TO OR RELIED UPON BY DEALER."

Downey is an independent distributor of BP and Chevron-branded gasoline and petroleum products. It also operates a chain of service stations called Kenjo Marts in and around Lenoir City, Tennessee. One of these Kenjo Marts is located just down the street from Clark's Emerald–Mart.

On November 30, 1993, BP sold to Downey the premises that Clark was leasing and assigned the 1992 Agreement to Downey. Following BP's sale of the premises and as-

signment to Downey, Downey began supplying Clark with BP-branded gasoline and petroleum products but did not provide price supports or any other downward price adjustments similar to those Clark had been receiving from BP. As a result, Clark paid a wholesale price for gasoline above the retail price charged at BP's company-owned stations. Furthermore, after the assignment, Clark had to pay Downey cash on delivery for gasoline because Downey did not provide the credit arrangements BP had granted. Clark also stopped receiving promotional materials from BP after the assignment.

With the 1992 Agreement set to expire on December 31, 1994, Clark wrote to BP in October 1994 inquiring about renewal. Later that month, BP curtly responded that his franchise agreement had been assigned to Downey and told him that any inquiries regarding the agreement or renewal of it had to be directed to Downey. Unable to get BP to discuss renewal of his franchise agreement, Clark filed suit against Downey and BP in the Blount County, Tennessee, Circuit Court on November 30, 1994. His complaint alleged multiple violations of the PMPA, breach of implied and express contractual provisions, breach of promise, breach of fiduciary duties, violations of the Tennessee Petroleum Trade Practices Act ("TPTPA"), fraudulent misrepresentation,[3] tortious interference, civil conspiracy to violate state and federal law, and breach of contract and fraud for anticompetitive purposes in violation of Tennessee public policy. In the complaint, Clark requested declaratory and injunctive relief, specific performance, and compensatory and punitive damages.

One month after he filed his complaint, Clark entered into a new agreement with Downey on December 30, 1994.[4] Under Clark's agreement with Downey ("the Downey Agreement"), Clark receives gasoline at the same wholesale price Downey charges

referred to as "direct supply dealers." Initially, Clark was a direct supply dealer.

**3.** Clark claims that agents of BP promised him that if the Emerald–Mart premises he leased was ever put up for sale, he would be given the opportunity to purchase it.

**4.** In his December 30, 1994 letter accepting the agreement, Clark expressly reserved all his rights under the PMPA and Tennessee law as well as any claims he had against BP. On December 30, 1994, BP and Downey removed Clark's suit to the United States District Court for the Eastern District of Tennessee.

other independent dealers it supplies. This wholesale price is, however, higher than the retail price charged at Downey-owned Kenjo Marts. This is because the Kenjo Marts receive gasoline pursuant to Management Fee Agreements under which Downey retains title to gasoline until it is sold, and following sale of the gasoline, the Kenjo Marts pay a commission to Downey. Thus, Clark now finds himself paying a higher wholesale price than the retail price charged at both Downey-owned Kenjo Marts and BP-owned and operated stations.

BP and Downey filed motions to dismiss or in the alternative for summary judgment. The district court granted the defendants summary judgment on the PMPA claims, the tortious interference claim, and certain other state law claims that were held to be preempted by the PMPA. The remaining state law claims were remanded to the Blount County, Tennessee, Circuit Court.[5]

## II

■ On appeal, Clark argues that the district court erred in concluding, as a matter of law, that BP did not constructively terminate or refuse to renew his franchise in violation of the PMPA. Clark also appeals the district court's grant of summary judgment on his claims against BP for breach of fiduciary duty, breach of implied duty of good faith, and certain other breach of contract claims against BP. He claims that a proper construction of the preemption provisions of the

PMPA does not mandate preclusion of these claims.[6]

### A. There was No Termination

■ The PMPA enumerates the exclusive means by which a franchisor engaged in the sale, consignment or distribution of motor fuel may terminate or nonrenew a franchise. *See* 15 U.S.C. § 2802(a). The general rule is that a franchisee must prove as a threshold matter that there has been a termination or nonrenewal of the franchise within the meaning of the PMPA before the protections of the PMPA are triggered. *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 923 (6th Cir.1989).

In *May–Som*, this court articulated two exceptions to this general rule that apply when a franchise is assigned:

[T]o sustain a claim, under the PMPA, that a franchisor assigned [7] and thereby *constructively* terminated a franchise agreement, the franchisee must prove either: (1) that by making the assignment, the franchisor breached one of three statutory components of the franchise agreement, (the contract to use the refiner's trademark, the contract for the supply of motor fuel, or the lease of the premises), and thus, violated the PMPA; or (2) that the franchisor made the assignment in violation of state law and thus, the PMPA was invoked.

869 F.2d at 922 (emphasis added). Clark contends that BP constructively terminated

---

5. The following state law claims were remanded to state court: (1) the breach of contract claims for allegedly failing to perform adequately under the 1992 Agreement; (2) BP's alleged breach of its agents' oral promises to allow Clark to buy the Emerald–Mart premises or grant him a right of first refusal; (3) the fraudulent misrepresentation claim; (4) the claim for breach of contract and fraud in violation of Tennessee public policy; and (5) the TPTPA claim.

6. On appeal, Clark also seeks a declaratory judgment to guard against Downey losing the right to license the use of the BP trademark. He concedes that the agreement between BP and Downey regarding use of the trademark has not yet been breached. The risk is merely speculative. Such speculative claims relating to the risk of a distributor losing the right to use a refiner's trademark at some future time cannot

prevail. *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 923 (6th Cir.1989) (rejecting franchisee's merely speculative claim that the distributor would lose the right to use refiner's trademark at some future time); *see Beachler v. Amoco Oil Co.,* 112 F.3d 902, 908–09 (7th Cir. 1997) (rejecting speculative claim that distributor might at some future time lose right to distribute refiner's product and use refiner's trademark).

7. The PMPA provides that:

Nothing in this subchapter ... prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provisions of State law which permits such transfer or assignment without regard to any provision of the franchise.

15 U.S.C. § 2806(b).

his franchise by: (1) breaching the portion of the 1992 Agreement relating to the lease of the Emerald–Mart premises and (2) by breaching the agreement for the supply of motor fuel by breaching the price term of the 1992 Agreement. He also argues that BP made the assignment in violation of Tennessee law.

### 1. There was no Breach of the Lease Component of the Agreement

 Clark argues that BP's sale of the Emerald–Mart premises and the assignment of the 1992 Agreement to Downey· violated the lease component of the agreement because, as he reads the agreement, it provides that he will lease the premises from BP, not Downey or any other entity. This argument relies upon the following language in the 1992 Agreement:

> WHEREAS, BP has a reputation· as a refiner ... [and has] acquired rights to certain properties which it is willing to lease to independent dealers....
>
> WHEREAS, Dealer desires to lease a facility owned or leased by BP for the purpose of operating such facility as a branded BP outlet....

This language cannot, however, support the weight Clark places on it. Any contention that these words are more than precatory and actually impose a binding obligation is belied by the paragraph immediately following them, which begins "NOW THEREFORE, in consideration of the mutual undertakings herein contained, BP and Dealer [Clark]· agree as follows...." The provisions following this preface place no limit or condition on BP's right to sell the premises during the term of the lease. Therefore BP did not breach the 1992 Agreement by selling the premises to Downey. Furthermore, as the district court noted, neither the sale of the premises nor the assignment of the agreement have prevented Clark from continuing to use the Emerald–Mart premises.

### 2. The Supply Component of the Agreement was Not Breached

 The price term in the portion of the franchise agreement pertaining to the supply of motor fuel provided that "[p]rices for all products purchased by Dealer from BP shall be BP's price in effect at the time and place of delivery for franchised Dealers. Prices for all products shall be subject to change without·notice to Dealer." Clark argues that this provision was violated the moment BP assigned the franchise agreement to Downey because after the assignment he was not paying a "BP price" for BP gas; but rather, a "Downey price" for BP gas. He further contends that a breach of the price term constitutes a breach of the supply component, and therefore renders the defendants liable under the PMPA as interpreted in *May–Som*.

Insofar as Clark does not claim that Downey refuses to supply him with gasoline, any change in the price paid for the gasoline does not implicate the supply component of the agreement.· In *May–Som*, 869 F.2d at 923, this court refused to find a breach of the supply component of an agreement where the assignee was supplying the dealer with gasoline, albeit at an increased price.

This is because the PMPA seeks to balance the "need to protect franchisees and the need to preserve for franchisors 'adequate flexibility so that [they] may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences.'" *Beachler v. Amoco Oil*, 112 F.3d 902, 904 (7th Cir.1997) (quoting S.Rep. No. 731, 95th Cong., 2d Sess. 17, 29, reprinted in 1978 U.S.C.C.A.N. 873, 877). The PMPA is a compromise and "constitute[s] a diminution of the property rights of franchisors and thus should not be interpreted to reach beyond its original language and purpose." *May–Som*, 869 F.2d at 921. Therefore, the PMPA is properly understood as affording franchisees "important but limited procedural rights" to protect them from "arbitrary and discriminatory termination or nonrenewal" by "adopting minimum standards governing the termination or nonrenewal of a petroleum franchise." *Beachler*, 112·F.3d at 904. The PMPA does not exist to redress every breach of an agreement between a gasoline station franchisee and franchisor.·

In *May–Som,* this court interpreted the minimum standards provided by the PMPA to permit a claim of constructive termination of a franchise resulting from an assignment only where there is a breach of one of the statutory components of the franchise—the contract to use the refiner's trademark, the contract for the supply of motor fuel, and the lease of the premises—or when the assignment violates applicable state law. *May– Som,* 869 F.2d at 922. The three aforementioned components were singled out for protection under the PMPA because a "franchise is defined in terms of a motor fuel trademark license." *Barnes v. Gulf Oil Corp.,* 795 F.2d 358, 364 (4th Cir.1986). And "leases of real property" and the "motor fuel supply agreements" are protected because termination or nonrenewal of these components "renders the trademark license valueless." *Ibid.* Thus, even if Clark can establish a breach of the price term, it does not trigger the protections of the PMPA since he still retains use of BP's trademark, use of the Emerald–Mart premises, and continues to receive BP-branded motor fuel.

■ Moreover, under existing precedent, Clark cannot complain about Downey raising the price for gasoline, because the price term Clark agreed to was an open price term under which BP, and therefore its assignee, were free to change the price charged for gasoline at any time. *See Shukla v. BP, Inc.,* 115 F.3d 849, 853 (11th Cir.1997) (holding that exact same price term in a BP franchise agreement was an open price term permitting BP's assignee to charge independent dealer a higher price than BP had charged). In short, Downey did nothing to Clark that BP could not have done to him. It does not matter that it was BP's assignee rather than BP who exercised the discretion permitted by the open price term in the franchise agreement.

Clark seeks to avoid the consequences of agreeing to an open price term by arguing that the open price term in the 1992 Agreement must be interpreted in light of Tennessee's Commercial Code, which he claims requires a seller to set a commercially reasonable price in good faith when the price term is open. Tenn.Code Ann. §§ 47–1–203,

47–2–305. He further contends that the price term is explained and supplemented by the course of dealing established between himself and BP under the 1992 Agreement, before the assignment to Downey. Tenn. Code Ann. § 47–1–205. According to this argument, the course of dealing established that "BP price" meant the tankwagon price posted at BP's Knoxville terminal. Clark further contends that the open price term cannot be construed as permitting Downy to charge him more than the tankwagon price posted at BP's Knoxville terminal because it would render the term "BP price" meaningless and that the moment he was charged more than the "BP price," as he defines it, the 1992 Agreement was breached.

Implicit in this argument is the proposition that the price Downey charges all its independent dealers, including Clark, is "commercially unreasonable." Clark's course of dealing argument also ignores what we have already noted: That PMPA termination claims stemming from an assignment must be predicated upon a breach of one of the three statutory elements of the franchise agreement—the contract for the supply of fuel, the lease of the premises, or the use of the trademark license. The PMPA is simply not concerned with "other contractual arrangements which may exist between a franchisor and a franchisee." *Shukla,* 115 F.3d at 854 (quoting S.Rep. No. 731, 95th Cong., 2d Sess. 17, 29, reprinted in 1978 U.S.C.C.A.N. 873, 888). Clark is, however, free to make this argument concerning the price term of the agreement in state court on the remand of his claim for breach of the 1992 Agreement.

### 3. The Assignment Did Not Violate Tennessee Law

■ The PMPA leaves to state law the validity of an assignment of a service station franchise, stating:

[n]othing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such

transfer or assignment without regard to any provision of the franchise.

15 U.S.C. § 2806(b)(1). Tennessee assignment law provides that:

[U]nless otherwise agreed, all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance.

T.C.A. § 47–2–210.[8] The 1992 Agreement precluded Clark from assigning the agreement but was silent as to BP's right to assign the agreement.

Clark does not contend that an express provision of the contract precludes an assignment of the 1992 Agreement under Tennessee law. Rather, he asserts that the assignment to Downey violated Tennessee assignment law because: (1) there was a material change in the risks and burdens imposed on him because following the assignment he paid a "Downey price" rather than a "BP price" for BP-branded gasoline; (2) his right to obtain return performance has been materially impaired by the cessation of price supports, credit arrangements, and promotional assistance that. BP's direct supply dealers receive; and (3) there was a material change in his duty as obligor because of increased rent, changes in gasoline pricing, and other costs imposed on him when he renewed his franchise with Downey in 1994.

These arguments are not persuasive. Clark's claim that the assignment of the 1992 Agreement violated Tennessee law because the increase in the price he paid for gasoline following the assignment constituted a material increase in the risks and burdens imposed upon him is without merit. This is because, as we have already explained, Clark agreed to an open price term. Since the express terms of the 1992 Agreement left BP and its assignee, Downey, free to raise the price Clark paid for gasoline, he cannot claim

that any post-assignment price increase constitutes an increased burden. *See May–Som*, 869 F.2d at 924 (rejecting argument that post-assignment rise in price of gasoline increased franchisee's burdens because contract contained an open price term).

Additionally, Clark's reliance on *Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 363–64 (4th Cir.1986), is misplaced. In *Barnes*, the dealer did not agree to an open price term. Rather, the price term simply provided that Texaco would provide the dealer with gasoline at Texaco's "posted retailer tankwagon prices." *Id.* at 361. Given this definite price term, the Fourth Circuit permitted the dealer in *Barnes* to reach the jury on the issue of whether the increase in the price he paid for gasoline following the assignment of his franchise constituted a material increase in his burden. This dealer faced a price increase of $1,000 per month.

The price Clark was charged following the assignment of his franchise, however, cannot be characterized as a *"material"* increase. The Lundberg Survey data Clark's expert presented to the district court demonstrates that he purchased 397,491 gallons of gasoline from Downey following the assignment of the 1992 Agreement. (JA 304(A)–304(D)). Clark paid Downey $408,845.97 for this gasoline and if he had been charged the "BP price," [9] instead of the "Downey price," this gasoline would have cost him $406,698.12. *Ibid.* This represents a total cost difference of $2,147.85 over the approximately eleven-month period spanning January 7, 1994 to November 18, 1994, or $195.26 per month. Per gallon, this represents a *one-half cent* increase. This simply does not amount to a "material increase." If it did, we would be at a loss to define a mere increase as distinguished from a "material increase."

Instead of relying on the Lundberg Survey data provided by Clark's expert, the dissent at page 397 derives its determination of the price increase following the assignment to Downey from Clark's own affidavit. (JA 111–16). But there is a significant problem

---

8. Tennessee, like many other states, has merely adopted verbatim section 2–210 of the Uniform Commercial Code.

9. For purposes of the Lundberg Survey, "BP Price" means the posted tankwagon price at BP's Knoxville terminal.

with relying on the estimates Clark makes in his affidavit. The problem is that Clark deems the "BP price" to include the price supports he received and then compares these artificially reduced prices to the price Downey charged. (JA 112) As noted earlier, *supra,* page 389, however, BP had no contractual obligation to provide price supports. Clark and the dissent cannot magnify the apparent burden resulting from the assignment by treating such a gratuitous benefit as a contractual right. Additionally, the estimates in Clark's affidavit are simply unsupported by the data provided by his own expert, the accuracy of which none of the parties dispute.

Furthermore, the cessation of price supports, credit arrangements, and promotional assistance cannot sustain a claim that return performance has been impaired because all of these programs were informal arrangements not required by the terms of the 1992 Agreement. As we just noted above, Clark cannot complain that he is no longer receiving a gratuitous benefit to which he had no right under the terms of the franchise agreement. *May–Som,* 869 F.2d at 925 (holding that termination of benefits to which dealer has no contractual right cannot be an increase of dealer's burdens).

■ Finally, Clark points to no authority granting him the right to receive rent and pricing terms in his 1994 agreement with Downey identical to those contained in the 1992 Agreement with BP. If BP had never assigned the 1992 Agreement, upon the agreement's expiration, BP would not have been required to sign a subsequent agreement with Clark containing terms identical to those in the earlier agreement. *See, e.g., Baldauf v. Amoco,* 553 F.Supp. 408, 411–12 (W.D.Mich.1981), *aff'd,* 700 F.2d 326 (6th Cir. 1983) (permitting franchisor to condition renewal on franchisee converting gasoline/service station into a high-volume pumper station that did not service cars although it did not make similar demands of other dealers). Similarly, BP's assignee, Downey was under no obligation to accept all of the terms of the 1992 Agreement in its subsequent agreement with Clark. Given the open price term in the agreement, Clark could not even expect to be charged the same price throughout the life of the 1992 Agreement, let alone be charged a set price throughout the term of both the 1992 Agreement and the Downey Agreement.

### B. BP Did Not Violate the PMPA by Failing to Renew Clark's Franchise

■ Clark also argues that the PMPA was violated even if the assignment was valid under state law and none of the statutory components of the franchise were breached. This is allegedly because BP's actions in assigning the agreement, selling the premises, and refusing to discuss renewal are an impermissible "end run" around the protections the PMPA provides franchisees. Specifically, Clark contends that BP's conduct was impermissible for two reasons. The first is because BP forced Clark to renew his franchise with Downey (rather than BP) and enter into an agreement containing terms that BP could not have imposed on Clark. According to Clark, since BP could not have imposed the terms that Downey did, the changes to the franchise relationship resulting from the Downey Agreement were not made in the normal course of business nor in good faith as required by 15 U.S.C. § 2802(b)(3)(A). The second reason is because BP refused to discuss renewal with Clark. This allegedly improper refusal to deal placed Clark between the Scylla of having no franchise with either BP or Downey upon the expiration of the 1992 Agreement and the Charybdis of accepting Downey's renewal terms, which allegedly constituted a forced novation of Clark's agreement with BP.

Clark's "end run" theory fails for several reasons. The most obvious is that under the Act Clark cannot claim nonrenewal. His franchise was in fact renewed—by Downey. A dealer whose franchise is assigned in the manner Clark's was "loses no rights that the PMPA was designed to protect because after the assignment, the dealer retains his rights under the Act if the distributor, now acting as 'franchisor,' should decide to terminate or not renew [his] franchise." *Beachler,* 112 F.3d at 906. Thus, before Clark could enlist the assistance of the PMPA, he did indeed

have to navigate his dealings to the point where he encountered Scylla, i.e., being without a franchise agreement with either Downey or BP. It was Congress's choice to force dealers to face such a peril in order to trigger the protections of the PMPA. And it is up to Congress, not this court, to decide when a dealer may invoke the protections of this statutory scheme. Clark cannot be excepted from making the threshold showing of an actual or constructive termination or nonrenewal before BP and Downey will be held to the standards of the PMPA.

Clark's "end run" argument also fails because it improperly relies upon two cases for the idea that upon expiration of the 1992 Agreement, BP could not have imposed the changes "forced" upon him in the Downey Agreement. One of these cases is *Baldauf*, which Clark believes would have precluded BP at the time of renewal from raising rent for the premises or the price it charged him for gasoline without imposing identical price increases on all of the other dealers it supplied directly. According to Clark, it follows from this premise that BP's assignee, Downey, was also precluded from charging Clark a higher price for the premises or for gasoline than that paid by other dealers supplied directly by BP. *Baldauf* does not, however, support the sweeping and categoric "like treatment" principle Clark attributes to it.

In *Baldauf*, a service station franchisee sued Amoco after he was served with notice that his franchise would not be renewed. The dealer alleged that Amoco had violated the PMPA by refusing to renew his franchise because he would not convert his combination gas station and auto repair garage into a business devoted exclusively to high-volume gasoline sales. *Baldauf*, 553 F.Supp. at 409. Amoco responded that the nonrenewal was justified under § 2802(b)(3)(A)(i)-(ii) of the PMPA, permitting nonrenewal if the franchisee refuses to agree to "changes or additions to the provisions of the franchise, if [they] are the result of a determination made by the franchisor in good faith and in the normal course of business...." The trial court

granted Amoco summary judgment, finding that the company had satisfied the PMPA's subjective good-faith standard as to the decision to convert the franchisee's location into a high-volume pumper station.[10] *Id.* at 411–12. Amoco *was not* converting all of its franchises to high-volume pumper stations. Therefore, the case does not stand for the sweeping proposition for which Clark cites it. Rather, *Baldauf* stands for the proposition that a franchisor may nonrenew when a franchisee refuses to accept new terms to the franchise relationship "[s]o long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal." *C.T. Massey v. Exxon Corp.*, 942 F.2d 340, 345 (6th Cir.1991); *see May–Som*, 869 F.2d at 927. Clark is also unable to rely upon *Baldauf* because, unlike the dealer in *Baldauf*, his franchise was renewed.

Moreover, Clark's reliance on *DuFresne's Auto Serv., Inc. v. Shell Oil Co.*, 992 F.2d 920 (9th Cir.1993), is misplaced. In that case, the Ninth Circuit did not reach the issue of whether franchisees in Clark's position could maintain a cause of action for nonrenewal under the PMPA. It reasoned that whether or not they had a cause of action was not germane because these "dealers' claims for nonrenewal, if any" would be barred by the statute of limitations for such claims. *Id.* at 927. Thus, there exists no authority under the PMPA or state law that would forbid BP, or Downey as assignee, from altering the terms of the franchise at the time of renewal.

### C. The District Court Properly Interpreted the PMPA's Preemption Provision

■ Section 2806(a) of the PMPA states:

To the extent that any provision of this subchapter applies to the termination (or furnishing of notice with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notice with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce or continue in effect any

---

**10.** The decision was found to satisfy the good-faith standard because Amoco had determined that the plaintiff's station would generate greater revenue for Amoco as a high-volume pumper

station and that it had greater potential than other stations as a high-volume pumper location. *Id.* at 411–12.

provision ·of law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notice thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable regulation of this subchapter.

This express preemption provision has been interpreted as "clearly intended to provide uniform minimum standards for the termination and nonrenewal of franchises and to bar state regulation of this area." *Continental Enters., Inc. v. American Oil Co.*, 808 F.2d 24, 27 (8th Cir.1986).

Consistent with this understanding of the express preemption provision of the PMPA, the district court held that some of Clark's claims were preempted. Specifically, Clark's claims that the defendants improperly terminated or refused to renew his franchise for purposes of the PMPA because they violated implied contractual duties, such as the duty of good faith, and fiduciary duties created by Tennessee law were held to be preempted. This conclusion was correct. These claims amount to an attempt to impose standards concerning termination and nonrenewal, and notice thereof, that are more stringent than those imposed by the PMPA. As such, they are clearly covered by the preemption provision of the PMPA. *See Consumers Petroleum Co. v. Texaco, Inc.*, 804 F.2d 907, 914–16 (6th Cir.1986) (holding similar claims premised on state law preempted by the PMPA); *see also Simmons v. Mobil Oil Corp.*, 29 F.3d 505, 512 (9th Cir.1994) (holding PMPA claim premised on implied state law duty of good faith preempted).

### III

For the foregoing reasons, we **AFFIRM** the district court's partial grant of summary judgment in favor of defendants and its remand of Clark's remaining claims to state court.

COLE, Circuit Judge, dissenting.

I write separately to express my disagreement with the majority's view that BP's assignment of the 1992 agreement could not create a material change in the agreement's price term in violation of Tennessee law. In my view, Clark may be able to benefit from the protections available under the PMPA upon constructive termination of a franchise agreement which can occur by, *inter alia*, a franchisor's assignment of a franchise agreement in violation of state law. *See May–Som*, 869 F.2d at 922.

An assignment is in violation of Tennessee assignment law "where the assignment would materially change the duty of the other party or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance." T.C.A. § 47–2–210(2). The Tennessee Court of Appeals has also explained that contractual rights may generally be assigned, unless, among other things, the assignment would materially change the obligor's duty, materially increase the burden or risk imposed on the obligor by the contract, materially impair the obligor's chance of obtaining return performance, or materially reduce the value of the contract to the obligor. *See Petry v. Cosmopolitan Spa Int'l, Inc.*, 641 S.W.2d 202, 203 (Tenn.Ct.App.1982) (citing *Restatement (Second) of Contracts* § 317(2) (1981)).

Here, the district court was presented with a contractual price term, "BP's price in effect at the time and place of delivery for franchised dealers," as well as the price actually charged by Downey. The district court held that as a matter of law an assignment of a contract with such a price term could not be materially altered in violation of state assignment law because the price term also provided that "[p]rices for all products shall be subject to change without notice to Dealer." *See Clark v. BP, Oil Co.*, 930 F.Supp. 1196, 1207 (E.D.Tenn.1996). Because of the "subject-to-change" provision, the district court regarded the agreement's price term as an "open price term" which precluded the possibility of there being a material change in price. *See id.* at 1208. I disagree that the agreement's price term is an unascertainable open price term which cannot, as matter of law, be altered in a materially burdensome way. *See Barnes v. Gulf Oil Corp.*, 795 F.2d 358 (4th Cir.1986) (reversing a Fed R. Civ. P. 12(b)(6) dismissal of PMPA claim premised

on assignment in violation of state law where agreement's price term for gasoline was defined as "seller's price in effect at time and place for delivery"); *cf. Beachler v. Amoco Oil Co.*, 112 F.3d 902, 908 & n. 5 (7th Cir. 1997) (holding that assignment imposed no materially increased burden as a matter of law where assignment expressly provided that dealers would accept the price established by an assignee in the event of an assignment). The agreement at issue specified a formula, "BP's price at the time and place of delivery for franchised dealers." A contract's price term fails to produce an ascertainable price under the contract's terms only when "the parties have specified how the price is to be determined but the method fails." James J. White & Robert S. Summers, *Uniform Commercial Code* § 3–8, at p. 115 (4th ed.1995). There is no suggestion that this agreement's price-setting method failed. In fact, the record includes the costs produced by the BP price term over the relevant time period. It is conceded that the BP price and the Downey price are different. The majority uses those figures in calculating the actual total cost difference paid by Clark: $2,147.85. The question presented to the district court was whether the difference in the two prices was a material difference such that the assignment constituted a contractual burden in violation of Tennessee assignment law. Clark presented evidence sufficient to create a material-fact-in-dispute on this front and accordingly should have survived the defendants' motion for summary judgment.

Additionally, I disagree with the majority in its decision to alternatively hold that the approximately $2100 difference in cost was not a material increase in Clark's contractual burden. The relevance of such a cost increase is made clear by Clark's report following his visits to local Downey service stations in an affidavit presented to the district court: "[s]ince Downey Oil began supplying my station, Downey has charged me a wholesale price that is greater than the retail price at the ... marts operated by Downey Oil Company, and I have personally purchased gasoline at these stations for a retail price that is less than the wholesale price Downey charged me on the same day." The majority asserts that the increase in Clark's costs

"simply does not represent a 'material increase.'" *See* p. 393 *supra*. In my mind, we are not in a position to make such a determination. The determination of what materially changes the duty of a party under a contract or increases a party's contractual risk or burden depends on the nature of the contract and the circumstances. *Restatement (Second) of Contracts* § 317 cmt. d (1981); 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 3–13, at p. 200 (4th ed.1995). Such a question of fact is more appropriately left to the district court in the first instance, particularly since it is equipped to allow discovery and take expert testimony. The increase in cost might be deemed material if, for example, it substantially disadvantaged a retailer such as Clark in his competitive position for gasoline sales as well as sales of other products. *Cf., e.g., Telephone Assocs. v. St. Louis County Bd.*, 364 N.W.2d 378, 382 (Minn.1985) (explaining that although a change in costs may seem minor, in a competitive bidding situation, contract awards are often determined by slight differences).

Where a franchisee avoided paying a petroleum distributor the proper price for delivered gasoline, resulting in a reduction of his bill of over $2000 over approximately one and half years, we held that such a breach of the price term was material and significant, and thus the PMPA allowed the distributor to refuse to renew the franchise agreement. *See Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1055 (6th Cir.1994). In *Geib*, the agreement's price term—the price in effect at the time when title to the gasoline passed from the franchisor to the dealer—did not preclude a materiality inquiry; I would employ the same reasoning in this case and conclude that the district court erred in holding that the assignment of Clark's agreement could not, as a matter of law, affect a material change in his agreement's price term. In my view, we must be careful to allow the PMPA to live out its purpose of "level[ing] the playing field on which [franchisors and franchisees] interact," *Beachler*, 112 F.3d at 904, and not foreclose PMPA claims which present issues of material fact; whether or not we like it, Congress has provided for protec-

tions under the PMPA when agreements are assigned in violation of state assignment law.